UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
　　　　　　　　　　　　　　　　　　　　　　　：

IN RE STILLWATER CAPITAL　　　　　　：
PARTNERS INC. LITIGATION　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：
This document relates to:　　　　　　　　：
11 Civ. 3081　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　：
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/23/12

OPINION AND ORDER

Master File No. 1:11-2275
(SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

This putative class action, alleging federal securities claims, is part of a larger multi-district litigation.  It arises out of a number of transactions through which Gerova Financial Group, Ltd. ("Gerova") acquired  Allied Provident Insurance Company, Ltd. ("Allied Provident"), the funds managed by Stillwater Capital Partners, LLC and Stillwater Capital Partners, Inc. ("SCP" or the "Stillwater funds"), and the Wimbledon Funds.  Plaintiffs' amended complaint alleges, inter alia, violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (Counts I and III); and violation of Section 20(a) of the Exchange Act (Counts II and IV).  Defendants now move to dismiss all claims. For the following reasons:  (1) Counts I and II as they pertain to Bianco are dismissed; (2) Counts III and IV are dismissed; and (3) Counts I and II as to

1

Gerova, Hirst, Hlavsa, van Roon, and Laslop may proceed.

## II.    BACKGROUND[1]

### A.    Plaintiffs

The proposed class consists of "all persons who purchased or otherwise acquired Gerova securities from January 8, 2010 through and including February 23, 2011."[2]

### B.    Defendants

There are ten named defendants in this action.  Gerova was incorporated and had its principal executive offices in Bermuda as of August 30, 2010.[3]  Gary Hirst was a founding sponsor of Gerova and was appointed its president in October 2007.[4]  He was Chairman of Gerova's Board of Directors from April 13, 2010 until he resigned in February 2011 and owned Gerova shares both directly and through Allius, Ltd. — one of the initial sponsors of Gerova.[5]

---

[1]    Unless otherwise noted, all facts are drawn from the Amended Complaint and are presumed true for the purposes of this motion.

[2]    Am. Compl. ¶ 1.

[3]    *See id.* ¶ 23.

[4]    *See id*. ¶ 24.  Hirst makes the same insufficiency of service of process arguments here as he did in the related case No. 11 Civ. 7107.  Those arguments are equally unavailing here.

[5]    *See id.*

Arie Jan van Roon was a founding member of Gerova's board until February 2011 and allegedly "owns or owned Gerova shares both directly and through Allius, Noble Investment Fund Limited, and Ho Capital Management LLC."[6]  Michael Hlavsa served as Chief Financial Officer ("CFO") of Gerova since the company's inception until at least February 2011.[7]  Joseph J. Bianco was Chief Executive Officer ("CEO") of Gerova from June 2010 until he resigned in February 2011.[8]  Keith Laslop was a Gerova director from May 2008 until his resignation on February 10, 2011.  He also served as Gerova's Chief Operating Officer ("COO") from June 2010 until at least February 2011.[9]  Plaintiffs allege Count I (violation of Section 10(b)) against each of these defendants and Count II (violation of Section 20(a)) against the individual Gerova defendants.

SCP, Inc. is a New York corporation that acts as investment manager

---

[6]     *Id.* ¶ 25.  Van Roon has failed to enter an appearance.

[7]     *See id.* ¶ 26.  Like Hirst, Hlavsa makes the same insufficiency of service of process arguments here as he did in the related case No. 11 Civ. 7107. Those arguments are equally unavailing here.  Since the opinion issued in related case No. 11 Civ. 2737, Hlavsa has sought the same jurisdictional discovery I granted to Hirst.  Because Hlavsa proceeded pro se in the prior actions, I will grant this discovery regarding the state-law claims in the related action, 11 Civ. 2737.

[8]     *See id.* ¶ 27.

[9]     *See id.* ¶ 28.  Laslop has failed to enter an appearance.

for the Stillwater Funds.[10]  SCP, LLC is a Delaware limited liability company that manages the business affairs of the Stillwater Funds.[11]  Jack Doueck was a principal of SCP, a Gerova director, and served on a three-person committee managing the Stillwater Funds after they were acquired by Gerova.[12]  Richard Rudy is a principal of SCP and sits on the same committee as Doueck.[13]  Plaintiffs allege Count III (violation of Section 10(b)) against each of these defendants and Count IV (violation of Section 20(a)) against the individual SCP defendants.

## C.  Gerova's Formation and the January 2010 Transactions

Gerova was formed as a blank check company in March 2007 under the name Asia Special Situation Acquisition Corp.[14]  Noble Investment Fund Ltd. and Allius Ltd., which were both owned and controlled by van Roon and Hirst, were Gerova's sponsors.[15]  Through its January 2008 IPO Gerova raised $155

---

[10]     *See id.* ¶ 29.

[11]     *See id.* ¶ 30.

[12]     *See id.* ¶ 31.

[13]     *See id.* ¶ 32.

[14]     *See id.* ¶ 35.  The company's name was changed to Gerova in conjunction with its acquisition of SCP, Allied Provident and Wimbledon.  *See* Gerova Proxy Statement ("Proxy Statement"), Ex. A to Am. Compl. ¶ 6.  For clarity, I refer to it as Gerova throughout this opinion.

[15]     *See* Am. Compl. ¶ 35.

4

million, and under the terms of its governing documents it was to use the IPO proceeds to acquire an operating entity within two years or it would face liquidation.[16]

As of November 2009 Gerova had not succeeded in acquiring an operating entity,[17] but in December 2009 it began merger negotiations with SCP, "a family of hedge funds" that held illiquid assets.[18]  Gerova negotiated a deal in which it acquired the Stillwater funds; an 81.5% interest in Amalphis Group Inc. ("Amalphis") the parent company of Allied Provident; and the assets and investments held by the Wimbledon Funds.[19]  Plaintiffs claim that the counter-parties to the Amalphis and Wimbledon transactions — Rineon Group, Inc. ("Rineon") and Weston respectively — were managed by Gerova insiders and that the related-party nature of these transactions was not disclosed in the proxy statement issued in conjunction with the January 2010 transactions.[20]  In exchange for the interest in and assets of SCP, Amalphis, and Wimbledon, Gerova issued

---

[16]     *See id.* ¶¶ 35-36.

[17]     *See id.* ¶ 36.

[18]     *Id.* ¶ 37.

[19]     *See id.* ¶¶ 37-38.  I refer to this throughout as the "January 2010 transactions."

[20]     *See id.* ¶ 39.

5

"restricted, preferred stock that [Gerova] anticipated later converting into ordinary shares."[21]

### D.   Allegedly False and Misleading Statements

Plaintiffs allege that the SCP assets were overvalued "premised on highly questionable assumptions"[22] and that "the $541.25 million valuation assigned to the Stillwater assets contradicted a substantially lower valuation by Stillwater . . . just weeks earlier."[23]   Plaintiffs also allege that the proxy statement did not disclose the distressed nature of the SCP Funds or that SCP was unable "to honor its investors' redemption requests."[24]   However, Gerova notes that the proxy statement did state that SCP's assets were "distressed and illiquid."[25]   Plaintiffs argue that the extent of the company's distress, including the amount owed in redemption requests was not properly disclosed.[26]

-----

[21]     *Id.*

[22]     *Id.*

[23]     *Id.* ¶ 82.

[24]     *Id.* ¶ 88.

[25]     Memorandum of Law in Support of Gerova Financial Group, Ltd.'s and Joseph Bianco's Motion to Dismiss Amended Class Action Complaint ("Gerova Mem.") at 2.

[26]     *See* Lead Plaintiffs' Omnibus Memorandum of Law In Opposition to Motions to Dismiss ("Pl. Opp.") at 10.   Plaintiffs argue that while the proxy statement "advise[d] investors that Stillwater *invests* in illiquid and distressed

Although the proxy statement mentioned the Amalphis and Wimbledon acquisitions, plaintiffs claim that they were "related party transaction[s] with an entity secretly controlled by Gerova insiders"[27] and that the related-party nature of the transactions was not disclosed.

Plaintiffs claim that the Amalphis transaction was a related-party transaction because the party from which Gerova acquired Amalphis was Rineon, "an inactive publicly traded Delaware corporation."[28]  Plaintiffs allege that Gerova director de Waal and Gerova CFO Hlavsa were two of Rineon's five directors, and that, after the January 2010 transactions, Hlavsa was Rineon's sole director until late 2010.[29]  Additionally, Rineon was acquired by the investment fund Intigy Absolute Return ("Intigy"),[30] which was managed by Axiat, Inc. of which Hirst is president and CEO.[31]  Plaintiffs also allege that Hirst made a profit of twenty-one million dollars by selling Amalphis to Gerova just six months after he, through

---

assets, [it] did nothing to inform investors that the Funds *themselves* were insolvent."  *Id.* at 20 (emphasis in original).

[27]     Am. Compl. ¶ 124.

[28]     *Id.* ¶ 74.

[29]     *See id.* ¶ 72.

[30]     *See id.*

[31]     *See id.* ¶ 73.

Intigy, had purchased it.[32]  None of these relationships were disclosed in the proxy statement.

Plaintiffs claim that the Wimbledon transaction was a related-party transaction because Gerova acquired it from Weston, which was owned by Fund.com.[33]  Gerova director van Roon held 59.34% of Fund.com's voting shares through his ownership of Equities Media Acquisition Corp.[34]  Futhermore, Hlavsa, Gerova's CFO, was a director and CFO of Fund.com at the time of the January 2010 transactions.[35]  Plaintiffs also claim that Bianco was both CEO of Gerova and Chairman of Fund.com's Board of Directors, and that Laslop was a director of both companies as well.[36]  As part of the Wimbledon acquisition, Gerova agreed to pay Weston a fee to manage the Wimbledon funds, but the amount of that fee was not disclosed.[37]

Since the January 2010 transactions, Rineon has ceased all operations

---

[32]     *See id.* ¶ 74.

[33]     *See id.* ¶ 78.

[34]     *See id.*

[35]     *See id.* ¶ 79.

[36]     *See id.*

[37]     *See id.*

and terminated its obligation to report.[38]  Between June and December 2010, Fund.com lost 98% of its market capitalization and announced that its financial statements for fiscal years 2007-2009 were unreliable.[39]

     E.    **Gerova's Collapse**

The January 2010 transactions triggered the original Gerova IPO investors' right to demand return of the capital they had invested, which approximately 97.4% of them did.[40]  This resulted in the "return of $112.4 million of the $115 million raised in the IPO."[41]  Gerova claims that "the loss of nearly all of its investment capital placed [it] in a more difficult liquidity position immediately following [the January 2010 transactions] than it could have anticipated."[42]

Following the January 2010 transactions, Gerova's "public float"[43] consisted of 300,000 IPO shares and Gerova received a de-listing notice from the

---

[38]    *See* No. 11 Civ. 7107, Amended Complaint ¶¶ 97-98.

[39]    *See* Am. Compl. ¶ 80.

[40]    *See id.* ¶ 42.

[41]    *Id.*

[42]    Gerova Mem. at 3.

[43]    "The securities held by persons other than affiliates of the issuer."  1A Going Public Corp. § 5:80 (quotation marks omitted).

New York Stock Exchange - Amex Exchange for failure to comply with the

minimum shareholder requirement.[44]  In April 2010, Gerova shareholders approved

conversion of the preferred shares issued as part of the January 2010 transactions

into ordinary shares.[45]  Gerova's share price increased from $7.42 on May 3 to

$15.96 on May 18 and share trading volume increased from 3,231 shares per day

in April to 167, 132 shares per day in June.[46]  Plaintiffs allege that this trading

volume "far exceed[ed] the plausible volume based on the outstanding float of

300,000 shares."[47]  Gerova's SEC filings confirmed that approximately 11.5

million additional shares had entered the market since January 2010.[48]  Because the

ordinary shares created through the conversion were unregistered, and Gerova

made no additional public offering, plaintiffs assert that the increase in share

volume can only be explained as "private stock issuances authorized by Company

insiders, or the removal of restrictions on previously-issued insider shares."[49]

---

[44]     *See* Am. Compl. ¶ 52.

[45]     *See id.* ¶ 53.

[46]     *See id.* ¶ 56.

[47]     *Id.* ¶ 65.

[48]     *See id.*

[49]     *Id.* ¶ 66.  Gerova argues that because of its status as a foreign issuer, it
could issue shares to foreign entities who could in turn trade them on the U.S.
market.  Whether the increase in trade volume was due to insider trading or was

10

Gerova's January 2010 income statement represented that it had approximately $1.5 billion in assets, "including cash and equivalents of $104 million,"[50] even though plaintiffs allege that Gerova was "cash flow insolvent" from the time of the January 2010 transactions[51] and was unable to meet its operating expenses.[52]  However, Gerova contends that it did not experience illiquidity until after the January 2010 transactions, when the redeeming investors were paid out in cash.[53]  Gerova made investor presentations in both January 2010 and May 2010, which "made nearly identical representations" regarding the acquisitions, except the valuation of the Stillwater funds was adjusted from $541 million to $535 million.[54]  Doueck testified in a separate action that "Gerova . . . did not have cash available to pay the [insurance] premiums"[55] and on June 7, 2011 a Bermuda newspaper reported that Gerova was "served notice for the termination

---

permissible because of Gerova's status, is more appropriately decided at the summary judgment stage, after the completion of discovery.  Additionally, finding in defendants' favor on this issue would not defeat any of plaintiffs' claims.

[50]    *Id.* ¶ 46.

[51]    *Id.* ¶ 47.

[52]    *See* Pl. Opp. at 13.

[53]    *See* Gerova Mem. at 4.

[54]    Am. Compl. ¶ 135.

[55]    *Id.* ¶ 105.

of its lease after failing to pay $49,083.40 in rent and service charges."[56]

Additionally, Gerova "disclosed that it was suffering from capital constraints" in

its June 2010 Form 20-F/A.[57]

On May 26, 2010, Gerova transferred its real estate assets to Net Five

in exchange for a minority interest in the venture.[58]  Plaintiffs claim that two of the

Net Five managers had prior involvement in investment frauds:  Robert Willison

"handled investor relations for Westmoore Capital . . . a Ponzi scheme halted . . .

by the SEC,"[59] and Jason Galanis was the subject of an enforcement action by the

SEC.[60]

After the publication of the "Dalrymple Report" by a short-seller firm

on January 10, 2011, which "detailed an array of related party transactions, . . .

insiders' relationships . . ., and questioned the valuation of Gerova's assets,"[61] the

price of Gerova shares fell from $28.04/share to a low of $5.28/share on February

---

[56]     *Id.* ¶ 108.

[57]     Gerova Mem. at 5.

[58]     *See* Am. Compl. ¶ 96.

[59]     *Id.* ¶ 97.

[60]     *See id.* ¶ 98.

[61]     *Id.* ¶ 156.

23, 2011.[62]  On February 23, 2011, the New York Stock Exchange ceased trading of Gerova stock, and Gerova securities were de-listed on April 18, 2011.[63]  Gerova terminated its stock registration on June 15, 2011.[64]  As of October 25, 2011, Gerova's share price was $0.08 and Gerova shares were traded "over-the-counter."[65]

Between January 2010 and February 15, 2011, Gerova experienced high management turnover, including various CEOs, managing directors, and presidents during that time.[66]  Plaintiffs claim that they were induced to purchase and retain Gerova shares due to the foregoing misstatements and omissions in the proxy statement and investor presentations.

## III.   LEGAL STANDARD — MOTION TO DISMISS

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] all factual allegations in the complaint as

---

[62]     *See id.* ¶¶ 156, 160.

[63]     *See id.* ¶ 160.

[64]     *See id.*

[65]     *Id.*

[66]     *See id.* ¶¶ 112, 115, 117.

13

true, and draw[s] all reasonable inferences in the plaintiff's favor."[67]  The court

evaluates the sufficiency of the complaint under the "two-pronged approach"

advocated by the Supreme Court in *Ashcroft v. Iqbal.*[68]  *First*, "[a] court 'can

choose to begin by identifying pleadings that, because they are no more than

conclusions, are not entitled to the assumption of truth.'"[69]  "Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not

suffice" to withstand a motion to dismiss.[70]  *Second*, "[w]hen there are well-

pleaded factual allegations, a court should assume their veracity and then

determine whether they plausibly give rise to an entitlement for relief."[71]  To

survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must

meet a standard of "plausibility."[72]  A claim is facially plausible "when the plaintiff

---

[67]     *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quotation marks omitted).

[68]     556 U.S. 662, 679 (2009).

[69]     *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 664).  *Accord Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

[70]     *Iqbal*, 556 U.S. at 663 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[71]     *Id.* at 670.  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

[72]     *Twombly*, 550 U.S. at 564.

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[73]  Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[74]

> "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."[75]  However, the court may also consider a document that is not incorporated by reference, "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."[76]  The court may also consider "legally required public disclosure documents filed with the SEC."[77]

## IV.   APPLICABLE LAW

---

[73]     *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

[74]     *Id.* (quotation marks omitted).

[75]     *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[76]     *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  *Accord Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

[77]     *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

A.      **Section 10(b) and Rule 10b-5 of the Securities Exchange Act**

Section 10(b) of the Securities Exchange Act of 1934 makes it illegal to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."[78]  Under Rule 10b-5 one may not "make any untrue statement of a material fact or [] omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."[79]  "To sustain a private claim for securities fraud under Section 10(b), 'a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"[80]

1.      **Misstatements or Omissions of Material Fact**

In order to satisfactorily allege misstatements or omissions of material

---

[78]    15 U.S.C. § 78j(b).

[79]    17 C.F.R. § 240.10b-5.

[80]    *Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 337 (2d Cir. 2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  *Accord Erica P. John Fund, Inc. v. Halliburton Co.*, — U.S. — , 131 S.Ct. 2179, 2184 (2011).

fact, a complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made."[81]  "For the purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."[82]  "[A]ttribution within a statement or implicit from surrounding circumstances is strong evidence" of who made the statement.[83]

"'[A] fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares [of stock].'"[84]  In situations "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."[85]  Mere, "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did[,] do not suffice to make out a claim of securities

---

[81]     *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (quotation marks omitted).

[82]     *Janus Capital Grp., Inc. v. First Derivative Traders*, — U.S. —, 131 S.Ct. 2296, 2302 (2011).

[83]     *Id.*

[84]     *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92-93 (2d Cir. 2010) (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994)).

[85]     *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (citation omitted).

17

fraud."[86]  "[A]n omission is actionable when the failure to disclose renders a statement misleading."[87]

### 2.   Scienter

A plaintiff may plead scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[88] "Sufficient motive allegations 'entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'"[89] "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."[90]

---

[86]   *Id.* (citation omitted).  *Accord Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).

[87]   *In re Alstom SA*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (citing *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)).

[88]   *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000)).  *Accord Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2011 WL 5170293, at *11 (S.D.N.Y. Oct. 31, 2011) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)).

[89]   *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (quoting *Novak*, 216 F.3d at 307).

[90]   *Id.  Accord ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

"'Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.'"[91] Under this theory of scienter, a plaintiff must show that the defendant's conduct is "at the least . . . highly unreasonable and [] represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[92] "To state a claim based on recklessness, plaintiffs may either specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements, or allege that defendants failed to check information they had a duty to monitor."[93]

### 3. Causation

A securities fraud plaintiff is required to "prove both transaction

---

[91] *Kalnit*, 264 F.3d at 142 (quoting *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)). *Accord South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009); *In re Novagold Res. Inc. Secs. Litig.*, 629 F. Supp. 2d 272, 297 (S.D.N.Y. 2009) (quoting *ECA*, 553 F.3d at 198-99).

[92] *South Cherry St.*, 573 F.3d at 109 (quotation marks and emphasis omitted). *Accord ECA*, 553 F.3d at 203.

[93] *In re Gildan Activewear, Inc. Secs. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) (quotation marks and citation omitted).

causation (also known as reliance) and loss causation."[94]  Loss causation is "the

proximate causal link between the alleged misconduct and the plaintiff's economic

harm."[95]  "A misrepresentation is 'the proximate cause of an investment loss if the

risk that caused the loss was within the zone of risk *concealed* by the

misrepresentations . . . .'"[96]  Therefore, "to plead loss causation, the complaint[]

must allege facts that support an inference that [defendant's] misstatements and

omissions concealed the circumstances that bear upon the loss suffered such that

plaintiffs would have been spared all or an ascertainable portion of that loss absent

the fraud."[97]

### B.      Control Person Liability Under Section 20(a) of the Exchange Act

"To establish a prima facie case of control person liability, a plaintiff

must show (1) a primary violation by the controlled person, (2) control of the

primary violator by the defendant, and (3) that the defendant was, in some

---

[94]      *ATSI*, 493 F.3d at 106.

[95]      *Id.* at 106-07 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346
(2005); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005)).
*Accord Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007);
*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d
Cir. 2003).

[96]      *In re Omnicom Grp., Inc. Secs. Litig.*, 597 F.3d 501, 513 (2d Cir.
2010) (quoting *Lentell*, 396 F.3d at 173) (emphasis in original).

[97]      *Lentell*, 396 F.3d at 175.

20

meaningful sense, a culpable participant in the controlled person's fraud."[98]

"Allegations of control are not averments of fraud and therefore need not be pleaded with particularity."[99]  "Thus, '[a]t the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard . . . .'"[100]  "While a party cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage."[101]

## V.     DISCUSSION

### A.     Section 10(b) and Rule 10b-5 of the Securities Exchange Act

#### 1.     Gerova and Gerova Officers' Liability

The proxy statement at issue was sent by Gerova to the plaintiffs in order to obtain their approval of the January 2010 transactions and was signed by

---

[98]     *ATSI*, 493 F.3d at 108 (citing *S.E.C. v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

[99]     *In re Parmalat Secs. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006).

[100]     *In re Scottish Re Grp. Secs. Litig.*, 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007) (quoting *In re Converium Holding AG Secs. Litig.*, No. 04 Civ. 7897, 2006 WL 3804619, at *14 (S.D.N.Y. Dec. 28, 2006)).

[101]     *In re American Int'l Grp., Inc. 2008 Secs. Litig.*, 741 F. Supp. 2d 511, 534-35 (S.D.N.Y. 2010) (citing *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 241 (S.D.N.Y. 2009)).

Hirst.[102]  Plaintiffs allege that the proxy statement failed to disclose the related-

party nature of the Amalphis and Wimbledon transactions,[103] which were part of

the January 2010 transactions.  Plaintiffs also claim that Gerova misstated its own

financial health and that of SCP in the proxy statement and in various financial

statements.[104]

      Gerova and Hirst contend that some of the complained of omissions

had already been disclosed in Gerova's various public disclosures.[105]  However this

in and of itself "would not preclude a finding by a trier of fact that [the information

was] disclosed to investors in a materially misleading way."[106]  Such "scattered

disclosures" are not sufficient for defendants to prevail at the motion to dismiss

stage.[107]  "The mere fact that a company has filed with a regulatory agency

documents containing factual information material to a proposal as to which

proxies are sought plainly does not mean that the company has made adequate

---

[102]    *See* Proxy Statement at iii.

[103]    *See* Am. Compl. ¶ 39.

[104]    *See id.* ¶¶ 104 (Gerova), 85 (SCP).

[105]    *See* Gerova Mem. at 13.

[106]    *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 618 F. Supp. 2d 311,
323 (S.D.N.Y. 2009).

[107]    *Id.* at 325.

disclosure to shareholders."[108]  The allegations of incomplete disclosures — such as Gerova's failure to disclose the potential exit of the IPO investors — satisfy the pleading requirements for material omissions.

Gerova also argues that certain omissions were not material, including the related-party nature of the transactions.  However, these omissions may have mislead investors regarding the actual demand for Gerova shares as well as the risk involved in the January 2010 transactions and the potential liabilities, thus misstating Gerova's "true financial picture."[109]  These omissions are not so obviously unimportant that their materiality can be successfully challenged at the pleading stage.[110]

Gerova officers Hirst, Hlavsa, and Bianco argue that they are not liable under Section 10(b) because none of the alleged misstatements or omissions

---

[108]    *United Paperworkers Int'l Union v. International Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (regarding a Section 14(a) claim).

[109]    *In re Alstom SA*, 406 F. Supp. 2d at 454.

[110]    *See Ganino*, 228 F.3d at 162 ("'[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'") (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

23

were attributed to them.[111]   However, Hirst signed "each of the key SEC filings

implicated in the Complaint"[112] and the proxy statement itself.[113]   *Janus*, which

involved two separate entities and whether statements of one could be attributed to

the other,[114] cannot be used to shield Hirst, who signed the documents at issue and

thereby "made" the alleged misstatements.   In response to an earlier motion in a

related case, I decided the issue of attribution on the grounds that Gerova was a

special purpose acquisition company, with "no operations and only a few

employees" and that its sole business purpose was the acquisition of other

companies.[115]   Construing the allegations in the light most favorable to the

plaintiffs and resolving all doubt in plaintiffs' favor, these are "adequate

surrounding circumstances" from which a reasonable fact finder could conclude

that the statements in the proxy statement were "made" by officers Hirst and

---

[111]      *See* Memorandum of Law in Support of Defendant Gary T. Hirst's
Motion to Dismiss the Amended Complaint at 13.

[112]      Pl. Opp. at 31.

[113]      *See* Proxy Statement at 6.

[114]      *See Janus*, 131 S.Ct. at 2300.

[115]      *In re Stillwater Capital Partners Inc. Litig.*, — F. Supp. 2d —, 2012
WL 1116421, at *11 (S.D.N.Y. April 3, 2012).

Hlavsa.[116]  Bianco, though, did not become a Gerova officer until June 2010, six

months after the proxy statement was sent to shareholders;[117] this fact precludes a

finding that the statements in the proxy statement and the January and May 2010

financial statements were made by him.

        Gerova contends that plaintiffs failed to plead scienter sufficiently.

Plaintiffs, in turn, point to Gerova's strong desire to effectuate the January 2010

transactions because it needed to acquire a company or it would be forced to

liquidate.  Additionally, plaintiffs claim that Gerova was in a dire financial

situation, even though Gerova contends that this did not occur until after the

January 2010 transactions, when the majority of IPO investors redeemed their

investments for cash.

        The desire to avoid impending liquidation was also a motivating

factor for the Gerova officers.  The Amended Complaint pleads these additional

facts as the basis for plaintiffs' allegations of the Gerova officers' scienter:  (1) the

resignations and deferred appointments of seven officers and directors and the

---

[116]    *S.E.C. v. Landberg*, No. 11 Civ. 0404, 2011 WL 5116512, at *4
(S.D.N.Y. Oct. 26, 2011) (quotation marks omitted) (finding circumstances
supporting attribution of fraudulent financial statements and marketing materials to
the defendant in his role as CFO).

[117]    *See* Am. Compl. ¶ 27.

replacement of Gerova's entire board of directors except Hirst;[118] (2) the alleged personal profits by Gerova insiders from the related-party transactions;[119] and (3) Gerova's transfer of all real estate assets to Net Five in exchange for a minority interest in the joint venture.[120]  Plaintiffs' allegations, taken as true, sufficiently plead that the conduct of the Gerova's officers was "highly unreasonable" and "an extreme departure from the standards of ordinary care . . . ."[121]

Because Gerova does not argue a lack of reliance, the only element left for plaintiffs to establish is loss causation.  Plaintiffs assert that loss causation is shown by the fact that once the Dalrymple Report was released — which contained allegations of the same relatedness and management fees that plaintiffs complain of as having been omitted from the proxy statement[122] — Gerova's ordinary shares fell 6.4%.[123]  The shares dropped an additional "19.4% . . . after Gerova announced it hired a firm to respond to the Dalrymple report," "40.8% after announcements regarding executive resignations," and 31.3% after a

---

[118]    *See id.* ¶¶ 112, 115, 117.

[119]    *See id.* ¶ 74.

[120]    *See id.* ¶ 96.

[121]    *Novak*, 216 F.3d at 308 (quotation marks omitted).

[122]    *See* Am. Compl. ¶ 154.

[123]    *See* Pl. Opp. at 35.

prospective president and chairman of the Board of Directors withdrew his name from consideration.[124]  These allegations satisfy the Second Circuit's rule for pleading loss causation — plaintiffs can show loss causation by showing "'that the defendants' misrepresentations induced a disparity between the transaction price and the true investment quality of the securities at the time of the transaction.'"[125] For the foregoing reasons, the motions by Gerova, Hirst, and Hlavsa to dismiss plaintiffs' Section 10(b) claims are denied.

### 2.    SCP and SCP Principals' Liability

Plaintiffs' claim against SCP hinges on the fact that the $541.25 million valuation attributed to the Stillwater Funds was provided by the Stillwater Defendants to Gerova.[126]  Even assuming, arguendo, that the unaudited pro forma financial statements including the $541.25 million valuation were "made" by SCP, they do not violate Section 10(b).  The valuation is surrounded by warnings that the amount was "subject to a post closing adjustment" and was "subject to further management review and may change materially between the preliminary valuation

---

[124]    *Id.* at 35-36.

[125]    *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 187 (2d Cir. 2001) (quoting *Suez Equity Investors v. Toronto-Dominion Bank*, 250 F.3d 87, 97-98 (2d Cir. 2001)).

[126]    *See* Am. Compl. ¶¶ 127, 139.

date and the closing date" of the January 2010 transactions.[127]  Taken in context,

these warnings, which occurred throughout the proxy statement and in close

proximity to the SCP asset valuation, would not have misled a reasonable

investor.[128]  Because the plaintiffs do not, and cannot, argue that SCP was

responsible for the remaining alleged omissions and misstatements in the Gerova

proxy statement and financial statements, Count III must be dismissed.

### B.    Control Person Liability Under Section 20(a) of the Exchange Act

Plaintiffs assert control person liability claims under Section 20(a) of

the Exchange Act against the individual defendants:  Hirst, van Roon, Hlavsa,

Bianco, and Laslop (Count II), and Doueck and Rudy (Count IV).  "While a party

cannot be held liable for both a primary violation and as a control person,

alternative theories of liability are permissible at the pleading stage."[129]  Because a

primary Section 10(b) violation has not been established against SCP, the Section

---

[127]    Proxy Statement at P-10.

[128]    *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.").

[129]    *In re American Int'l Grp.*, 741 F. Supp. 2d at 534-35 (citing *Police & Fire Ret. Sys. of City of Detroit*, 645 F. Supp. 2d at 241).

20(a) claim against Doueck and Rudy necessarily fails. However, as demonstrated above, a primary Section 10(b) violation has been pled against Gerova, which satisfies the first prong of Section 20(a).

The parties agree that Bianco did not assume the role of Gerova CEO until June 2010, after the alleged misstatements and omissions.[130] Without more, the 20(a) control person liability claim against him must fail. All other Gerova defendants merely contend that the 20(a) claims against them must be dismissed based on plaintiffs' failure to sufficiently allege a primary violation. Because the 10(b) claim survives against Hirst, Hlavsa, van Roon, and Laslop, the 20(a) claim against them also survives.

## VI.   CONCLUSION

For the foregoing reasons, Counts I and II as they relate to Bianco, Count III, and Count IV are dismissed. All other counts remain. The Clerk of the Court is directed to close these motions [Docket Nos. 54, 57, 60].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              April 23, 2012

---

[130]    *See* Am. Compl. ¶ 27.

**Appearances**

**For Plaintiffs:**

Jonathan Richard Horne, Esq.
Laurence Matthew Rosen, Esq.
Phillip C. Kim, Esq.
The Rosen Law Firm, P.A.
275 Madison Avenue, 34th Floor
New York, NY 10016
(212) 686-1060

Gregory Bradley Linkh, Esq.
Murray Frank LLP
275 Madison Avenue, Suite 801
New York, NY 10016
(212) 682-1818

**For Defendants SCP, Doueck, and Rudy:**

Christopher Patrick Greeley, Esq.
Arthur Glenn Jakoby, Esq.
Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016
(212) 592-1426

**For Defendants Gerova and Bianco:**

Alex M. Weingarten, Esq.
Eric Bennett Carlson, Esq.
Ethan J. Brown, Esq.
Weingarten Brown LLP
10866 Wilshire Blvd., Suite 500
Los Angeles, CA 90024
(310) 229-9300

Jeffrey K. Logan, Esq.

Spillane Weingarten LLP
1100 Glendon Avenue, Suite 1200
Los Angeles, CA 90024
(310) 229-9300

**For Defendant Hirst:**

Joshua Samuel Sohn, Esq.
DLA Piper US LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500

**For Defendant Hlavsa:**

Benjamin Sean Fischer, Esq.
Linda Fang, Esq.
Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C.
565 Fifth Avenue
New York, NY 10017
(212) 880-9585